1
2
3
4                              UNITED STATES DISTRICT COURT
5                            NORTHERN DISTRICT OF CALIFORNIA
6
7    DEBORAH RANDALL,                          Case No. 15-cv-04343-JST
8                  Plaintiff,
9         v.                                   **ORDER GRANTING DEFENDANTS'**
                                               **MOTION FOR SUMMARY JUDGMENT**
10   METROPOLITAN LIFE INSURANCE               **AND DENYING PLAINTIFF'S MOTION**
     COMPANY, et al.,                          **FOR SUMMARY JUDGMENT**
11                Defendants.                  Re: ECF Nos. 35, 36
12
          Before the Court are Plaintiff's and Defendants' cross-motions for Summary Judgment.

13   ECF Nos. 35, 36.  The Court will grant Defendants' motion and deny Plaintiff's motion.

14   **I.      BACKGROUND**

15        Plaintiff Deborah Randall ("Randall") brought this action under section 502(a)(1)(B) of the

16   Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), seeking to

17   recover short-term disability, long-term disability, and related health, dental, vision, and life

18   insurance benefits under her Plan administered by Metropolitan Life Insurance Company

19   ("MetLife").  ECF No. 1.

20        **A.      Randall's Work History and Alleged Disability**

21        Both parties agree that Randall had a successful career and at the time of onset for her

22   alleged disability was employed by Verizon Wireless as a facilities network engineer.  ECF No. 37

23   at 5.  Randall's DOT title was "Supervisor, Network Control Operators," which is a "light work"

24   job.  ECF No. 35-6 at 350.  According to the DOT, Randall's job required her to be able to lift,

25   carry, push, and pull 20 lbs. occasionally and up to 10 lbs. frequently, and walk and/or stand

26   frequently.  Id.  MetLife also verified that "[t]he light job duties of a facilities network engineer

27   include functional requirements of: designing and implementing facilities for the transport and

28

United States District Court
Northern District of California

switching of long distance traffic, maintaining path, switch, and vendor diversity where economically justified, devises routing schemes as may be required to prevent blocked calls," as well as various supervisory and participatory activities, but "[t]here is no lifting or heavy physical activity involved," and Randall sat "in a cubicle."  ECF No. 35-6 at 338, 345.

Randall suffers from "a longstanding condition of chronic and severe mid-back pain," which has progressed over time.  ECF No. 36 at 6.  She has a history of breast cancer and has received diagnoses of anterolisthesis, cervical disc disease, osteoporosis, lupus, myofascial pain syndrome, anxiety, and depression.  See ECF No. 36.  Randall now alleges that her back pain is exacerbated by sitting, standing, reaching, or keyboarding, and that her pain, fatigue, and impaired concentration due to pain medication make it impossible for her to perform the essential functions of her job.  ECF No. 36 at 6-7.

Randall went on disability leave as of April 15, 2013 and requested disability benefits on April 19, 2013.  See ECF No. 36 at 6; ECF No. 35-7 at 266.  MetLife approved Short Term Disability benefits for Randall for the period between April 15, 2013 through May 6, 2013, but communicated to Randall on June 15, 2013 that benefits would not be approved beginning May 7, 2013.  ECF No. 36-3 at 98.  Randall returned to work on July 15, 2013 and continued to work through August 7, 2013.  ECF No. 35-6 at 337-38.  She then worked partial hours for the period of August 8, 2013 through August 30, 2013 and went back out of work completely as of August 31, 2013.  Id.  Randall submitted claims for both short-term and long-term disability benefits under her Disability Plan, but MetLife denied her claims.

### B. Randall's Benefits Plan

#### 1. Short Term Disability

Randall's plan provided for Short Term Disability benefits for up to 26 weeks if she was found to be totally disabled.  ECF No. 36-2 at 21.  A "Total Disability" is defined under the plan as follows:

> You are considered totally disabled under the *Plan* for purposes of [Short-Term Disability] benefits if, as a result of illness, injury or pregnancy, MetLife determines that you meet all of these conditions:
>
> • You are absent from work for at least 8 full consecutive calendar days

United States District Court
Northern District of California

beginning with and including your first day absent from work because you are unable to perform for any Employer the *Essential Functions* of *Your Occupation*[1] for which you are qualified by training, education or experience; and

- You have provided to MetLife objective medical evidence that sufficiently evidences, as determined by MetLife, that you cannot perform the *Essential Functions* of *Your Occupation* for which you are qualified by training, education or experience for any Employer.  Your ability to get to and from the work place is <u>not</u> considered when determining whether you cannot perform the *Essential Functions* of *Your Occupation* if driving is not an *Essential Function* of *Your Occupation* . . .

- You are receiving *Appropriate Care and Treatment* and complying with the requirements of such treatment; and

- You are unable to earn more than 80% of your pre-disability earnings at *Your Occupation*; and

- You are not engaged in any job/occupation, including self-employment, during the [Short-Term Disability] application process or while you are receiving [Short-Term Disability] benefits; and

- All information or documents to be considered has been received during the *Initial Administration Period* of your . . . claim.

ECF No. 36-2 at 18.  The Plan stated that Randall was "responsible for proving [her] disability claim."  <u>Id.</u>  It instructed that she "must return a signed authorization form to MetLife allowing [her] *Physician(s)* to release objective medical evidence to substantiate [her] condition and ongoing treatment, as determined by MetLife," and that benefits would automatically "be denied if [she or her] doctor or qualified practitioner fails to provide objective medical evidence in support of [her] claim within the time period specified by MetLife."  <u>Id.</u>  The Plan specifically stated that "[a] *physician*'s note stating" that Randall "should not work is not objective medical evidence sufficient to prove [her] claim."  <u>Id.</u>  The Plan provided some guidance as to objective medical

---

[1] Under the terms of the Plans at issue, "Your Occupation" is defined as "[t]he employment activity that you regularly performed at Verizon Wireless immediately prior to the disability for which you are receiving benefits under this *Plan*."  ECF No. 36-2 at 45. In addition, the Plans provide that: "*Your Occupation* is not limited to the specific position you held with Verizon Wireless, but encompasses similar positions/activities that could be performed for another employer, based on job descriptions provided by the employer or included in the most current volume of the U.S. Department of Labor's Dictionary of Occupational Titles."  ECF No. 36-2 at 45.

United States District Court
Northern District of California

evidence:

> Objective medical evidence is necessary to clinically substantiate your condition and includes, but is not limited to:
>
> - A diagnosis of your medical condition.
>
> - Objective findings such as test results, X rays or operative notes supporting your claim for benefits.
>
> - Any other information related to your individual circumstances that MetLife determines is necessary to decide whether your claim should be approved or denied.
>
> - You and/or your *Physician(s)* may be required to provide additional information to substantiate ongoing treatment and/or evidence to support your continuing claim for short-term disability benefits.  The costs associated with providing this information are your responsibility.

ECF No. 36-2 at 19.  In determining whether or not a plan participant has submitted sufficient objective medical evidence, MetLife considers "documents submitted by" the individual and/or that individual's physician, "such as lab reports, medical testing reports, examination notes, and the like, as well as any other *Relevant Documents* MetLife deems necessary . . . including, but not limited to, any reviews or examinations conducted by *Physician(s)* employed or engaged by MetLife.  In making its determination . . . MetLife may also attempt to contact the *Physician(s)* involved in the diagnosis and treatment of [the individual's] medical condition.  Although MetLife may attempt to contact the *Physician(s)*, it is [the individual's] responsibility to provide MetLife with the objective medical evidence required . . . Failure to [do so] will result in the denial of" the individual's claim.  Id.

### 2.  Long Term Disability

The Plans' summary plan description ("SPD") explains that "You will be eligible for LTD [Long Term Disability] benefits if you are continuously disabled and unable to return to work after receiving [Short-Term Disability] benefits for 26-weeks—provided you are certified as disabled under the LTD benefit component of the Managed Disability Plan and meet all other requirements detailed below."  ECF No. 36-2 at 27.  The relevant sections of the Plan define LTD as follows:

> You are considered disabled if MetLife determines that you have experienced, on

or after the effective date of your LTD coverage under the LTD benefit component of the Managed Disability Plan, a significant change in your physical or mental condition as a result of accidental injury, sickness, mental illness, substance abuse or pregnancy.

Under the LTD benefit component of the Managed Disability Plan, an employee is considered to be "disabled" when the employee is absent from work because of an impairment for which there is sufficient objective medical evidence that supports:

For the first 24 months beginning with the *LTD Effective Date*:

- The employee cannot perform the *Essential Functions* of his or her job at Verizon Wireless.

- The employee cannot perform the *Essential Functions* of his or her occupation for which he or she is qualified by training, education or experience for any Employer.

For the period after the first 24 months beginning with the *LTD Effective Date*:

- The employee cannot perform the *Essential Functions* of any occupation for which he or she is qualified by training, education, or experience for any Employer.

During the period of disability, the employee must:

- Be receiving *Appropriate Care and Treatment* and complying with the requirements of such treatment;

- For LTD benefits, during the qualifying period and the next 24 months of sickness or accidental injury, the employee must not be able to earn more than 80% of the employee's pre-disability earnings at the employee's own occupation for any employer in the employee's local economy. After the expiration of the qualifying period and the next 24 months, the employee must not be able to earn more than 60% of the employee's pre-disability earnings from any employer in the employer's local economy at any *Gainful Occupation* for which the employee is reasonably qualified taking into account the employee's training, education and experience.

ECF No. 36-2 at 27-28. The Plan also speaks to "Disability Due to Mental or Nervous Disorders or Diseases, Neuromusculoskeletal and Soft Tissue Disorders, Chronic Fatigue Syndrome and Related Conditions." ECF No. 36-2 at 31. The Plan limits benefits for disability caused by mental or nervous disorders or neuromusculoskeletal and soft tissue disorders to a maximum of 24 months:

If an employee is disabled due to one or more of the conditions set forth below,

5

MetLife will limit the employee LTD benefits to a lifetime maximum equal to the lesser of:

- 24 months; or

- The maximum benefit period.

Employee LTD benefits will be limited as stated above for the following conditions:

- A Mental or Nervous Disorder or Disease with the exception of:
    --Schizophrenia;
    --Dementia; or
    --Organic brain disease.

- Neuromusculoskeletal and soft tissue disorders including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless there is definitive objective medical evidence of:
    --*Seropositive Arthritis*;
    --*Spinal Tumors*, Malignancy, or *Vascular Malformations*;
    --*Radiculopathies*;
    --*Myelopathies*;
    --Traumatic *Spinal* Cord Necrosis; or
    --*Musculopathies*.

- Chronic Fatigue syndrome and related conditions.

Mental or Nervous Disorder or Disease means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders as of the date of the employee's disability. A condition may be classified as a Mental or Nervous Disorder or Disease regardless of its cause.

ECF No. 36-2 at 31.  Randall's plan also indicates, however, that the "certificate of insurance" governs the determination of her Long Term Disability benefits.  ECF No. 38 at 7.  The certificate of insurance states:

Disabled or Disability means that, due to Sickness or as a direct result of an accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and

- You are unable to earn:

- During the Elimination Period and the next 24 months of Sickness or accidental

injury, more than 80% of Your Predisability Earnings at Your Own Occupation
from any employer in Your Local Economy . . .

ECF No. 36-2 at 65.  The certificate also requires the claimant to submit all medical information

that MetLife "may reasonably require to document" the claimant's disability.  Id. at 86.[2]

### C.    Medical Evidence and Short Term Disability Claim

#### 1.    April - July 2013

In April 2013, when Randall first determined that she could no longer work due to her

pain, she was treated by her primary care physician, Dr. Amanda Camposagrado, an internist.

See ECF No. 36-2 at 113-116. Randall saw Dr. Camposagrado for a visit on April 16, 2013.  ECF

No. 36-3 at 41.  Dr. Camposagrado noted that while Randall self-reported her pain as "10/10,"

tests provided an "[u]nremarkable MRI of the thoracic spine, with stable very slight levoconvex

curvature."  Id.  She stated that while Randall was "reporting pain," she was "able to move about

without pain."  Id. at 43.  She explained that Randall's back pain was "of unclear etiology," that

her "MRI was unrevealing," and that she "suspect[ed]" the problem was "musculoskeletal."  Id.

She noted that a "[o]ne week work-excuse [was] given," and that she advised Randall "to avoid

laying for prolonged periods during the day and get up out of bed and remain active in day to day

activities as tolerated."  Id.  In further notes from the visit, Randall's "problem list" remarked that

she had experienced "[r]ecurrent episodes of midback pain flares since 1982."  Id. at 44.

Amir Badawi, M.D., saw Randall on April 17, 2013 for back pain.  ECF No. 36-3 at 48.

Dr. Badawi noted that "[t]he patient wants to go on disability and says she [] will be addressing

this issue with her PCP tomorrow."  ECF No. 36-3 at 48.  He stated that "Examination of the back

shows no gross deformities.  There is some Pigmentation over the mid part of the vertebral column

---

[2] With regard to her Long Term Disability claim, Randall argues that since the governing
certificate of insurance does not state that objective evidence is required to establish eligibility for
LTD benefits, see ECF No. 36-2 at 13, that language in the SPD does not control, ECF No. 38 at
7.  To support this proposition, Randall cites to Pritchard v. Metro. Life Ins. Co., 783 F.3d 1166,
1171 (9th Cir. 2015), which held that the controlling MetLife certificate of insurance did not
provide for any discretion to MetLife, and therefore a de novo standard of review applied despite
the presence of discretionary language in the SPD.  Id.  The dispute is irrelevant here, however,
because upon a stipulated de novo review the Court concludes Randall has not submitted sufficient
evidence of disability to establish that MetLife erred in denying her short term benefits during the
26-week elimination period.

United States District Court
Northern District of California

t. The examination is confusing as at times palpation of the lower thoracic and upper lumbar vertebrae causes pain but other times the patient says that she feels better when the area is palpated." Id. at 50.  He noted that MRIs and Xrays had not shown any abnormalities.  Id. at 51.

Randall had another visit with Dr. Camposagrado on April 22, 2013.  ECF No. 36-3 at 30. Dr. Camposagrado noted that Randall "reports she is taking Vicodin from her friend" and "that she doesn't have enough Norco."  Id. at 32.  She "[r]eports she is afraid she will lose her job and that she can't work because of her pain.  She reports she needs to be on disability."  Id.  She was advised not to take her friend's Vicodin.  Id.  Dr. Camposagrado described Randall as "[v]ery anxious," and "walking around the room, rubbing her mid back."  Id. at 34.

On April 24, 2013, Dr. Camposagrado explained that she "again attempted to reassure Patient that MRI of T-spine did not show any concerning abnormalities to account for her mid back pain.  However, did advise to obtain Bone scan as previously ordered. . . . Will give her one week extension for her time off; but again emphasized to her that no abnormalities on MRI to justify long term disability.  FMLA form completed . . . Also recommended that she go to chronic pain group visits."  Id. at 36.  Dr. Camposagrado spent a "total of 40 minutes" with Randall "and more than 50% of the time spent on counseling and coordinating care."  Id.

Dr. Camposagrado completed a Certification of Health Care Provider for Employee's Serious Health Condition form for Randall and UC Davis Medical Group faxed it to MetLife on April 25, 2013.  ECF No. 36-2 at 113-116.  That form stated Randall was unable to work because of "an acute worsening of condition" between April 16, 2013, and April 30, 2013.  Id. at 115.  Dr. Camposagrado also opined, however, that Randall could work for three hours per day, two days per week, from April 30, 2013, until May 30, 2013.  Id.

Dr. Camposagrado also referred Randall to Dr. Peter Gerritz, an orthopedist, for further review of her chronic back pain.  ECF No. 36-3 at 22.  Dr. Gerritz noted on April 29, 2013 that her "[p]ain first episode [was] at age 30," and that her "[c]urrent flare started in February 2012."  Id. He noted that she "was previously seen by Dr. Vandenakker at spine clinic who diagnosed her with myofascial pain.  She had a poor interaction and requested a second opinion.  In the past, she received Requist for osteoporosis with worsening low back pain.  She then had a repeat injection.

Each pain flare is different.  She thinks her pain is from a nerve." Id. at 23.  Randall reported she was not able to perform more activities while on her opioid medications, that she was not willing to consider weaning off her pain/central acting medications and started crying when it was brought up. Id. Dr. Gerritz noted that while moderate improvement was noted with physical therapy, Randall "does not follow up with her home exercise program, heat, ice, traction, tens." Id.

Randall reported that during the last month she had functionally "avoided going to work, performing household chores, yard work, shopping, socializing with friends, participating in recreation, and exercising," but "[s]he does not have any limitations in activities of daily living." Id. Dr. Gerritz's impression was that Randall had "chronic back pain due to myofascial pain syndrome," "poorly controlled depression/anxiety," a "history of psychological stress (PTSD)," and that she "demonstrated maladaptive behaviors including reinforcement of pain behaviors, punishment of well behavior, belief that hurt signals physical damage, belief that one is disabled by pain, belief that pain must decrease before one can function well, focusing on pain, ruminating about negative beliefs (catastrophizing), asking for assistance when in pain, resting when in pain," and "guarding." Id. at 26.  He noted that he counseled Randall "on lack of efficacy for opioids and long term side effects," but she was "not willing to reduce" her medication and believed she could "not function without her opioids." Id. Dr. Gerritz spent a total of 55 minutes with Randall, and then "verbally asked PsyD Dr. Debra Fishman to see" Randall that day for health and behavior counseling. Id. at 26-27.  He stated that he thought Randall's "pain is myofascial," and it would benefit her to implement "behavioral changes." Id. at 28.  He stated that he would "advise against NSAIDs and Narcotics as they can cause more side effects than proven efficacy." Id.

Randall saw Dr. Camposagrado again April 30, 2013.  ECF No. 36-5 at 15.  Dr. Camposagrado noted in her report that in a "follow up [on her] mid back pain," Randall reported "feeling pretty good right now; sore but not painful." Id. The "[v]isit was progressing and Patient was amenable to plan of weaning off of Percocet . . . However, when we discussed return to work. [sic] Patient became visibly upset/tearful.  She reports she doesn't want to lose her job or her house.  Patient asked how she can go back to work when she can't even sit up to pay her bills at home.  She requested for extended disability.  Encouraged to return to work at half time.

1    However, she reports she really can't go back to work.  After prolonged discussion, I discussed

2    will provide another 1 week off work but plan to return to work thereafter."  ECF No. 36-3 at 15.

3          On May 6, 2013, Randall spoke with Dr. Gerritz again.  ECF No. 36-3 at 8.  He noted that

4    Randall had "chronic back pain due to myofascial pain syndrome," and was "escalating her dose

5    of opioids, yet functionally is worsening."  ECF No. 36-3 at 8.  Yet while "[i]maging findings

6    showed mild C5-6 spondylolisthesis . . . her pain [did] not fit this referral pattern," and "[h]er

7    physical exam did not show any focal neurological deficits."  Id.  The plan from her previous

8    session April 29, 2013 was noted as "[l]ook into getting a Yoga DVD, attend church services, and

9    practice 4-7-0 relaxation breathing."  Id. at 9.  Her pain was described as an "8/10," just as it was

10   at her last visit.  Id.  Dr. Gerritz's report noted that he had reviewed Dr. Camposagrado's report

11   from April 30, 2013, that Randall "was also advised to return to work and was resistant," and that

12   she was "making more a connection between her anxiety and flare of her pain symptoms."  Id. at

13   11.  Dr. Gerritz noted that Randall was "contemplative today regarding weaning herself off pain

14   medications eventually."  Id. at 11.

15         Dr. Gerritz stated in his "recommendations" that Randall should do some exercises and

16   referred her to health and behavioral counseling, but said nothing about her ability to work.  Id.

17   Randall's "problem list" stated that she had had anxiety, myofascial pain syndrome, and

18   osteoporosis dating back to March 5, 2012.  Id. at 12.  The report also noted "[o]pioid abuse, binge

19   pattern," as of April 29, 2013.[3]  Id.

20         Randall saw Dr. Camposagrado once again on May 7, 2013.  ECF No. 36-3 at 56.  Dr.

21   Camposagrado wrote that Randall's back pain was "[s]till there, constant, [and was] waking her up

22   in middle of the night."  Id.  She noted that Randall had gotten a "squeeze ball, which she reports

23   really helps."  Id.  Randall reported to Dr. Camposagrado that "she still is not able to work and

24   would like to 'heal,'" but "she cannot go back to work even at half time.  She wants her pain to

25   resolve before returning to work."  Id. at 57.  Dr. Camposagrado "[d]iscussed this is not realistic

26

27   ───────────────
     [3] Drs. Camposagrado and Gerritz later responded to emails from Randall stating that they had not
28   placed the diagnosis of opiate abuse in her chart, and that they would remove it for her.  ECF No.
     35-5 at 260-61.

United States District Court
Northern District of California

and the goal is to minimize her pain but also to return to normal daily activities.  After another extensive discussion, will give her one additional week off but that she really needs to prepare to resume work (at least half time) next week."  Id. at 57.  In the notes under "Follow up bone scan," Dr. Camposagrado noted a "subtle small focus of mild increased activity projecting over the left sixth rib without definite radiographic correlation.  Significance is uncertain."  Id.  Randall "was positive during the entire exam until we started talking about having her go back to work and then she became very anxious and somewhat tearful."  Id. at 59.  Dr. Camposagrado wrote that she "[d]iscussed I'm not sure if Dr. Gerritz would be able to assist her in her leave but again emphasized goal to resume work."  Id.  Dr. Camposagrado wrote Randall a doctor's note "to certify that Deborah Randall was examined on 5/7/2013 and is not able to work thru 5/14/13 due to a medical condition."  ECF No. 36-3 at 92.

Also on May 7, 2013, UC Davis Medical Group Folsom faxed MetLife information from Randall's recent doctors' visits.  ECF No. 36-3 at 2-6.  The record stated that there was a "subtle small focus of mild increased activity projecting over the left sixth rib without definite radiographic correlation," but that the "significance is uncertain."  Id. at 4.  An MRI revealed that Randall's "[v]ertebral bodies demonstrate normal signal, stature, and alignment.  There is no evidence of focal or destructive lesion . . . there is very slight levoconvex curvature . . . No significant degenerative changes are identified."  Id. at 6.  The overall "impression" was that it was an "unremarkable MRI of the thoracic spine, with stable very slight levoconvex curvature."  Id.  The report estimates a "return to work date" of May 8, 2013, which was then "modified to" May 14, 2013.  Id. at 3.

Randall's diagnoses were noted as myofascial pain syndrome (primary), anxiety, insomnia, a history of breast cancer, and osteoporosis.  Id. at 7.  Randall was given clonazepam to take from April 23, 2013 until October 20, 2013, Voltaren from April 16, 2013 to April 11, 2014, Colace from April 30, 2013 to May 1, 2014, Cymbalta from April 30, 2013 to April 30, 2014, Robaxin starting April 30, 2013, Percocet from April 22, 2013 to April 22, 2014, and had been taking Tagamet since August 7, 2012.  Id.

On May 13, 2013 Randall spoke with Dr. Gerritz again.  ECF No. 36-3 at 64.  Dr. Gerritz

United States District Court
Northern District of California

noted that on May 7, 2013, Randall's "PCP" (Primary Care Practitioner) "advised her to return to work." ECF No. 36-3 at 64. He wrote that Randall "[a]sked if I would handle her disability due to her PCP being off work," but "[s]he was instructed to follow up with colleague of Dr. Camposagrado as I agree she needs to return to work." Id. Gerritz noted that Randall had "still not returned to work," and "continue[d] to endorse she needs to be pain free in able to function." Id. at 65. He wrote in his overall "impression" that "She continues to take herself off work without any clear medical justification other than anxiety." Id. at 66.

On May 16, 2013 Randall had another visit with Dr. Badawi, who would later become her primary care physician. ECF No. 36-3 at 68. Dr. Badawi discussed positive test results with Randall and "she was very pleased to hear them," but she still complained "of her mid back pain and her inability to go back to work as a consequence of that . . . [Randall was] adamant about her inability to go back to work right now because of the pain." Id. at 70. Dr. Badawi stated that at times Randall "would be calm and composed, particularly when reviewing records over the computer with her," but then "she would quickly revert to the pacing back-and-forth along the room. The moment we started talking about her return to work she became very tearful saying that she is in so much pain she cannot go back to work. She looks very anxious and there clearly is an ongoing psychiatric problem that could very well be contributing to her complaint of pain." Id. at 72. He noted that "[e]xamination of the back shows no gross deformities except for some pigmentation along the mid part of the vertebral column. No tenderness on palpation along the vertebrae or over the adjacent muscles. Slight tenderness under the left scapula." Id. Dr. Badawi wrote that he "spent 40 minutes with the patient more than 50% of which was in counseling regarding her pain, anxiety as well as her latest PET/CT results. I explained to the patient that I strongly believe that she has an ongoing anxiety disorder that needs to be addressed more thoroughly by a psychiatrist while addressing the myofascial pain problem. The patient was at first resistant to [t]he notion but with counseling she accepted it." Id. Dr. Badawi wrote a note for Randall excusing her from work for the next seven days. Id. at 93.

Randall spoke with Dr. Gerritz again on May 20, 2013. ECF No. 36-3 at 78. Dr. Gerritz noted Randall's "[w]orsening insomnia," as she "was unable to [sleep] for 37 hours starting

1   Saturday AM.  Ran out of Percocet Thursday.  Her covering internist refused to refill on Friday."

2   ECF No. 36-3 at 78.  He noted that "[s]he continues to take[] herself off work without any clear

3   medical justification other than anxiety."  Id. at 79.  She was, however, able to exercise despite

4   pain.  Id.

5       On May 20, 2013 Randall also had a visit with Dr. Jeffrey Applebaum, in family practice.

6   ECF No. 36-3 at 81.  The reason for her visit is stated as "back pain – out of medication."  Id.  His

7   notes state that Randall "called over the weekend because of back pain and was hoping for trigger

8   point steroid injection.  Her workup of the T-spine has been negative for neoplasm, infection,

9   degenerative changes or evidence of trauma."  Id.  There were "[n]o trigger point areas of

10  tenderness found along the thoracic spine," so no injection was given.  Id. at 83.  Dr. Applebaum

11  noted that Randall should "manage with medication as before."  Id.

12      On May 22, 2013, Randall saw Dr. Badawi once again.  Dr. Badawi noted that "[t]he

13  patient states that her pain is not enabling her to go back to work, because she could 'do [her] bills

14  on the computer with difficulty but can't sit long enough to do my work as I am constantly

15  scratching my back.'"  Id. at 87.  While she was instructed to "increase her Cymbalta," she had not

16  done it because she was scared of the medication.  Id.  He noted that "[t]hroughout the

17  appointment today, the patient would become very tearful whenever mention is made of her

18  returning to work.  Her PCP had clearly stated in her last note that she wanted the patient to at

19  least go back to half-time work.  The patient says that at this time she cannot at all go back to

20  work but at the same time she does not want to lose her job," saying "'I know how my work is

21  demanding.'"  Id. at 88.

22      Dr. Badawi spent over an hour with Randall and "reviewed in detail the results of her latest

23  MRIs nuclear medicine and PET/CT scan tests.  The results so far have been unremarkable and

24  there is nothing tangible that would explain the patient's pain.  The patient is very worried about

25  going back to work but at the same time says that she cannot handle the stresses of her current job.

26  Discussed with the patient perhaps switching to a different job.  The patient however says that the

27  current job is a well-paying one.  She is telling me that if she can go on disability then she would

28  not lose her current job.  I explained to the patient that at this time I cannot proceed with a

13

permanent disability claim based on her physical condition particularly given the unremarkable recent imaging as well as her primary care doctor's recommendation for the patient to go back to work at least half time.  I explained to her that her pain could be partly due to psychiatric problems and hence the need for psychiatric evaluation."  Id. at 90.  On May 23, Dr. Badawi wrote a note excusing Randall from work up to and including June 8, 2013, pending further evaluation.  ECF No. 36-3 at 94.

Additional records from Randall's May medical appointments were faxed to MetLife May 29, 2013.  ECF No. 36-3 at 54.   MetLife approved Short Term Disability benefits for Randall for the period between April 15, 2013 through May 6, 2013, but communicated to Randall on June 15, 2013 that benefits would not be approved beginning May 7, 2013.  ECF No. 36-3 at 98.  The letter thoroughly summarized Randall's doctors' visits throughout May 2013 and showed that while Randall continued to receive off work notes throughout the rest of May and the beginning of June, her primary doctor wrote her an excuse note begrudgingly and strongly suggested Randall return to work at least part time after May 7, 2013.  Id. at 98-99.  The other doctors either agreed with Randall's primary doctor's conclusion, or did not provide any detailed reasons why Randall could not work.  Id. at 99-100.  There were no "restrictions and limitations" given that would preclude Randall from "performing the essential duties" of her occupation.[4]  Id. at 100.  The letter advised Randall that she could appeal the decision within 100 days.  Id.  The letter explained that if Randall had "recent medical documentation not previously submitted which you believe may assist us in evaluating your claim for benefits, please forward this information to us for review on appeal.  In particular, office visit notes from your last two office visits including results of any objective medical testing, laboratory etc., documentation relative to your functional capabilities, restrictions and/or limitations, an assessment regarding your ability to return to work and/or your return to work plans."  Id.

Drs. Camposagrado and Badawi certified Randall as unable to work through June 11, 2013 and on June 11, 2013 Dr. Badawi stated that Randall was capable of working at "half-time

---

[4] An error in the letter listed Randall's position as a "heavy" occupation when it is a "light" occupation.

14

capacity." ECF No. 36-3 at 114-120.   None of the off-work notes provided any restrictions or limitations or explanations for what was preventing Randall from full-time work.  Id.

On June 27, 2013 Dr. Hisham Soliman, MD, MPH, wrote that Randall was prescribed psychiatric medications and was "not able to work full-time.  She is to be excused from any full-time work until 07/15/13.  Deborah is able to work part-time." ECF No. 36-3 at 121.  On July 30, 2013 Dr. Soliman wrote that Randall would continue to receive regular psychiatric care, and that it was "medically necessary that Ms. Randall temporarily work half days until 09/24/2013 due to her severe back pain which is affecting her mental illness." Id. at 122.  Dr. Soliman also provided MetLife with a psychiatric questionnaire dated August 12, 2013, which in part addressed Randall's diagnosis of Major Depressive Disorder, and noted Randall's "ability to remember and perform tasks [was] impaired," and estimated her return to work date as "10/18/13." ECF No. 35-3 at 154.  On August 29, 2013 Dr. Soliman wrote "I feel Deborah should be off work from September 3, 2013 and return back November 3, 2013." ECF No. 36-3 at 123.  Dr. Soliman indicated in a letter on October 28, 2013 that due to Randall's prescribed medications, she should be off work from October 28, 2013 through December 9, 2013.  ECF No. 35-3 at 155.

On June 26, 2013, Dr. Yang, a pain specialist, wrote that Randall did "not exhibit any drug seeking behaviors and actually wants to get rid of medications and get back to work.  At this point she just cannot do that because of the severe pain limiting her." ECF No. 35-6 at 421.

On July 9, 2013, Dr. Yang wrote that Randall's pain was at "10/10." ECF No. 35-6 at 431.  On July 18, 2013, Dr. Yang wrote under "subjective complaints" that, on her pain meds, Randall's pain was "at 3/10." ECF No. 35-6 at 422.  On July 26, 2013, Dr. Yang wrote that Randall had "thoracic degenerative disc disease" and that Randall had been given an epidural steroid injection.  ECF No. 35-6 at 427.  On July 29, 2013, Dr. Yang wrote that the epidural had not provided Randall with relief, that she could not sleep or work, and that while myofascial release treatment worked, it was not covered by her insurance so she did not do it.  Id. at 428.  Dr. Yang wrote under "treatment plan": "I don't know what is going on.  In the next couple of weeks we will consider ordering a thoracic spine MRI and we will ask her to continue myofascial release treatment . . . I also recommend she see a psychiatrist to assess her depression because I think she is depressed."

1    Id. at 429.

2              2.      **Recurrent Short Term Disability Claim and Further Medical Evidence**

3         Randall returned to work on July 15, 2013 and continued to work through August 7, 2013.

4    ECF No. 35-6 at 337-38.  She submitted a recurrent Short Term Disability claim on August 8,

5    2013, worked part time from August 8, 2013 through August 30, 2013, and left work completely

6    as of August 31, 2013.  Id.

7         Randall's benefits Plans stated in a section on "Return to Work" that "[a]t any time while

8    you are receiving STD benefits, MetLife may determine you are no longer disabled.  If such a

9    determination is made, your STD benefits will end on the last date of your approved disability, at

10   which time you are required to return to work.  In some situations, MetLife may determine you are

11   partially disabled and work with you and Human Resources to return you to work on a part-time

12   or light duty basis, or in another capacity."  ECF No. 35-2 at 15.  If a participant returns to work

13   for a period of less than ninety-one days, the subsequent disability is not considered a new

14   disability, but a continuance of the prior claim.  Id. at 15-16.

15        In his notes from a visit with Randall on August 19, 2013, Dr. Yang wrote under

16   "subjective complaints" that the thoracic epidural did not work and "she is not able to work at this

17   point due to her thoracic spine pain . . . she needs at least 4 Norco per day."  ECF No. 35-6 at 433.

18   Under treatment plan he wrote "she is not able to function at all without meds," but he did not

19   detail any specific functional limitations when she did take them.  Id. at 434.  Dr. Yang also filled

20   out a physician questionnaire on that date, stating that Randall could sit for zero hours, stand for

21   one hour intermittently, walk for one hour intermittently, could not climb, twist, bend, stoop, or

22   reach above shoulder level, and could only lift/carry up to ten pounds occasionally.  ECF No. 35-7

23   at 5.  He opined that Randall could work up to four hours per day, standing, with breaks every

24   fifteen minutes to stretch or walk.  Id.  He listed her estimated return to work date as "unknown."

25   Id.  He wrote that she was unable to do "typing or any type of work when pain flares up."  Id. at 7.

26   He felt that Randall would be incapacitated from August 19, 2013 to August 19, 2014, but that she

27   could work four hours per day, five days per week.  Id.  He stated that during pain flares she

28   would be "unable to perform any functions," and estimated the frequency of flare ups to be four to

United States District Court
Northern District of California

five per day, for one hour per episode.  Id. at 7-8.

Records from a "disc and pain center" Randall visited indicated that on August 20, 2013 the assessment was that Randall was "improving."  ECF No. 35-6 at 390.  On August 22, 2013 Randall indicated "slight improvement," but that she was "still having difficulty working/sitting." ECF No. 35-6 at 340, 391.

On September 4, 2013 MetLife wrote to Randall that it had "determined that we are unable to approve STD benefits.  We have concluded that you did not meet the definition of disability as required to approve benefits under the terms of the Verizon Wireless Managed Disability Plan." ECF No. 36-3 at 102.  While her "claim was initially approved from April 15, 2013 through May 06, 2013 because the medical information initially received substantiated with clinical evidence that [her] symptoms were of such a severity and occurred with such frequency that [she was] unable to work during that time period," MetLife was after that "unable to determine what functional limitations exist that prevent you from performing the requirements of your occupation as an Engineer of network facilities." Id. at 103.  "The medical documentation did not indicate any abnormal physical exam specific restrictions and limitations, or examination or diagnostic test results to support an ongoing functional impairment.  There were no detailed observations or collateral information to help support the nature and severity of your problems and no medical reason or rationale to support why you were unable to return to work.  There was no specific information about the intensity, frequency and duration of your symptoms and no explanation how these symptoms prevented you from functioning on a daily basis." Id.  Randall's "recurrent claim" was denied "effective August 08, 2013." Id.

On September 11, 2013 Randall appealed the denial of her STD benefits, stating she had had back pain every day since February 2012.  ECF No. 36-3 at 106.  She repeated her complaints of pain symptoms and her inability to function normally, and stated that her doctors' treatment plans and the medications she was provided were not sufficiently helping her heal.  Id. at 106-07. She defended her credibility and stated "If you review my attendance prior to my disability you would find I wasn't one to take sick days and barely took vacation days.  I even tried my best to work through my pain up until April 15th when it became unbearable." Id. at 107.  She admitted

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that she "took more pain medication than was prescribed to get through the day" at work.  Id.  She

2    stated she loved her job and tried her best to work even though it was painful for her and she

3    believed it worsened her condition.  Id.  She felt that her doctor did not believe in her, and that her

4    record included misstatements and mischaracterizations about her care.  Id.  On September 30,

5    2013, MetLife acknowledged receipt of the appeal request and informed Randall it needed an

6    additional 45 days to render a decision on October 22, 2013.  ECF No. 35-6 at 441.

7         On September 16, 2013 Dr. Yang wrote that he had reviewed an MRI with Randall and

8    "her thoracic spine has no problems."  ECF No. 35-6 at 437.

9         On October 2, 2013 MetLife received Randall's medical records from Dr. Yang.  ECF No.

10   35-6 at 418.  Also in October 2013, Randall's Occupational Therapist, Kathleen O'Brien,

11   indicated that Randall should be able to go "back to work part time ~5 hours per day using

12   adjustable standing desk."  ECF No. 35-3 at 155.

13        MetLife also had two independent physician consultants, Dr. Jackson and Dr. McPhee,

14   review Randall's records.  Dr. Jackson reported that Randall's STD benefits were previously

15   approved, then terminated beginning 5/7/13 due to insufficient evidence of functional impairment.

16   ECF No. 35-6 at 373.  Dr. Jackson indicated that the medical information Randall submitted did

17   not support functional limitations beyond 5/07/13 until 7/14/13 and from 8/08/13 onward.  Id.  Dr.

18   Jackson wrote that a letter from Randall on September 11, 2013 indicated she "became depressed

19   and discouraged after 7/26/13, when an epidural injection failed to relieve her pain.  She saw Dr.

20   Soliman, who, she said, insisted she return to work."  Id. at 374.

21        Dr. McPhee indicated that based on a phone call with Dr. Rosenberg, Randall's

22   chiropractor, on October 29, 2013, "it would be reasonable to limit reaching, and also to limit

23   lifting/carrying," but they "did not discuss the degree to which lifting/carrying would be

24   restricted."  Id. at 385.  Dr. Rosenberg stated that Randall appeared to have instability of the six,

25   seven, and eighth ribs, as well as myofascial pain.  ECF No. 35-6 at 343.  Dr. Rosenberg

26   "acknowledged that [Randall] appeared to have a high degree of pain sensitivity."  Id.  Dr.

27   McPhee stated, however, that she "would still expect the claimant to be able to stand, walk and sit,

28   since this should not cause physical damage, but it would also be reasonable for the claimant to be

1    able to briefly change position throughout the work day because of the myofascial component of

2    her complaints." Id. at 385. She stated that Randall's "complaints . . . were consistent from one

3    visit to the next, and only very temporarily relieved with chiropractic treatment." Id. Due to

4    Randall's medical problems, Dr. McPhee felt that "[d]uring the time periods in question through

5    to the present it may be reasonable to limit lifting/carrying to light weights of possibly 20 pounds

6    occasionally and up to 10 pounds frequently, and to limit reaching above shoulder level to an

7    occasional basis. She could also limit having the upper extremities fully outstretched to short

8    periods at a time on a non-repetitive basis." Id. at 385.

9        From November 5, 2013 through March 3, 2014, Dr. Sandy Bell treated Randall and

10   communicated to MetLife that Randall was only capable of sitting 20 minutes at one time due to

11   severe pain, and that she could at most "occasionally" reach, handle or keyboard in a work day.

12   ECF No. 35-5 at 185, 187-88.

13       On November 22, 2013, MetLife had a vocational consultant analysis performed by Renee

14   Lange, a Vocational Rehabilitation Consultant. ECF No. 35-6 at 351. Ms. Lange concluded that

15   Randall had the residual functional capacity to return to her own light duty occupation with any

16   employer. Id.

17       On December 12, 2013, MetLife wrote to Randall to inform her it had upheld on appeal

18   the original determination to terminate STD benefits. ECF No. 35-6 at 337. The letter stated that

19   "from the physical perspective there did not appear to be significant findings in support of

20   physical functional limitations for the time periods in question, although [Randall] continued to

21   have ongoing pain complaints." Id. at 343. "[T]here were no examination findings or

22   investigations on which to base physical function limitations from [Randall's] prior level of

23   activity." Id. Randall's physicians "did not provide evidence to support side effects from the

24   medications" she was taking "that would have resulted in functional limitations for the periods in

25   review." Id. at 344. MetLife "verified with [Randall's] employer that [her] occupation is

26   considered light duty, and that [she] sit[s] in a cubicle." Id. at 345. She was "not required to do

27   any lifting," and her "occupation is not physically demanding." Id.

28       On December 30, 2013, Randall reported in her "personal profile" for MetLife that she had

19

experienced changes in her ability to care for her personal needs and grooming.  ECF No. 35-6 at
149-150.  She had begun to wash her hair only once a week due to pain, wore minimal makeup
only when going out, and she reported that her back spasms prevented her from wearing a bra or
shoes other than flats.  Id.

### 3.    Long Term Disability ("LTD") Benefits

On December 23, 2013, MetLife wrote to Randall regarding the LTD benefits available
under the Plans and to request that she complete forms in support of her claim.  ECF No. 35-6 at
162.  MetLife conducted an interview with Randall, and she indicated she was receiving state
disability benefits.  Id. at 196.  She related that her back pain started in January 2012 and became
progressively worse.  Id. at 197.  She released to MetLife her personal profile and other requested
forms.  Id. at 135.

### 4.    2014 Medical Records and Communications with MetLife

Dr. Yang's January 2014 notes indicated that he did not think Randall was able to work
because of depression.  ECF No. 35-3 at 156.

On February 27, 2014, MetLife wrote to Randall to inform her she did not qualify for LTD
benefits effective February 7, 2014 because she had not been disabled throughout the 26 week
elimination period as required under the plan.  ECF No. 35-6 at 133.

A March 3, 2014 "Workplace Arrangement Request Form" from Dr. Bell indicated that
Randall had difficulty sitting, walking, or standing for more than 20 minutes.  ECF No. 35-5 at
193.  A March 4, 2014 form from Dr. Yang stated restrictions including sitting, walking or
standing limited to 20 minutes.  ECF No. 35-5 at 193.  Dr. Bell stated on March 10, 2014, that
Randall's prognosis was "guarded due to the severity" of Randall's pain.  ECF No. 35-5 at 187.
She wrote that Randall could only reach, handle, and finger occasionally.  Id. at 189.        On
March 14, 2014, MetLife sent Randall a letter giving her 180 days to submit an appeal.  ECF No.
35-6 at 131.

Dr. Bell wrote on May 13, 2014 that Randall had been seen for a "full orthopedic and
neurologic evaluation" on March 6, 2014 and "a positive Hoffman's sign and Babinski's Sign was
noted."  ECF No. 35-5 at 190.

United States District Court
Northern District of California

1    Dr. Biljinder Chima became Randall's PCP and saw her from May 29, 2014 to July 24,

2   2014.  ECF No. 35-3 at 156.  Randall underwent numerous x-rays and imaging studies in

3   specialist evaluations throughout that period.  Id.  Dr. Chima wrote that during the time he treated

4   Randall, "from May 2014 through July 2014," she had "consistently reported ongoing severe and

5   chronic myofascial pain ranging from 2/10 to 10/10 in her thoracic spine region, at times radiating

6   up to her cervical spine region (including her shoulder) and down to her lumbar spine region,

7   despite taking appropriate pain medications prescribed by her pain management doctor."  ECF No.

8   36-6 at 16.  He stated he had "found positive findings on clinical examination, including positive

9   bilateral para spinal muscle tenderness and spasm on palpation at the 1I 0 level of the thoracic

10   spine and a positive right-sided Spurling's Maneuver."  Id.  MRIs "showed foraminal narrowing at

11   multiple levels (including 50% left and 50-75% right foraminal narrowing at C5-6) as well as

12   anterolisthesis of C5 or C6."  Id.

13    He stated that "Ms. Randall's reports of pain have been consistent and credible and

14   consistent with my clinical findings on observation and examination."  Id.  "Based on Ms.

15   Randall's consistent reports of pain and my findings on clinic observation and examination, it is

16   my professional opinion that Ms. Randall's restrictions and limitations should include sitting no

17   more than 15-20 minutes at one time and keeping fingering and handling movements to a

18   minimum, as it appears that those activities among others trigger the pain flares in her thoracic

19   spine regions.  Given these restrictions and limitations, it is my professional opinion that Ms.

20   Randall could not perform the duties of her previous position as a Facilities Network Engineer or

21   any comparable professional sedentary position on a consistent full-time basis."  Id.  While a June

22   3, 2014 MRI of Randall's thoracic spine showed "no disc herniation, no stenosis, no alteration of

23   the caliber of the central canal or neural foramina," it did show a "Spurlings Maneuver - positive

24   right-sided," and "cervical disc degeneration with foraminal narrowing."  ECF No. 35-5 at 17-18.

25    On July 16, 2014, Dr. Yang stated that Randall's sleep was affected by severe pain in her

26   back and neck, and that she was unable to sit or stand in one place for more than 20 minutes

27   before experiencing increased pain.  ECF No. 35-5 at 196.  On July 17, 2014, Dr. Chima

28   diagnosed Randall with a "soft tissue disorder."  ECF No. 35-5 at 14.

United States District Court
Northern District of California

United States District Court
Northern District of California

On September 17, 2014 ISIS Healthcare performed a functional capacity evaluation with Randall, who presented "with a diagnosis of Cervical DDD and thoracic pain." ECF No. 35-4 at 438. The report indicated that while Randall "did not perform with determined consistent effort," she "was consistent in her report of pain throughout the evaluation and she is able to perform a maximum of sedentary work level at this time secondary to pain." Id. She was only able to sit for 10 minutes without difficulty, and stand for 13 minutes. Id. "She was distractible and had difficulty following instructions." Id. The report also indicated, however, that "[d]uring [the] initial part of evaluation," Randall "began crying, went to another room, and laid on the floor with the foam roller on her cervical region, which appeared inconsistent with where she had been rubbing/complaining of pain initially." Id. at 439. The report concluded she could do occasional sitting or standing. Id. at 442.

### 5.    Randall's Appeal of her STD and LTD Claims

On July 10, 2014 and October 27, 2014, Randall's attorney requested an extension of Randall's appeal deadline to December 8, 2014, which MetLife granted. ECF No. 35-6 at 97, 107. On December 8, 9, and 18, 2014, and January 23, 2015, Randall's attorney wrote letters to MetLife in support of her appeal of both her STD and LTD claims, enclosing additional medical records and reports. See ECF No. 35-3 at 143, 269.

Randall's family wrote declarations in support of her appeal. Randall's ex-husband, Jeff Randall, wrote in a declaration on December 5, 2014 that it was clear to him that Randall was "unable to do her job," that he had traveled "from Los Angeles or Oregon" to "stay with her for a week at a time" and help her, and that she was "one of the hardest workers" he knew before her back problems worsened. ECF No. 35-5 at 198-99. He also noted that she "was always trying to reduce her use of medications." Id. at 199. Randall's daughter, Danielle Bledsoe, stated that "since 2012" when Randall aggravated her back, her "back problem" had been "so serious that she has had no choice but to stop working and rely on my help." Id. at 202. She stated that her mom would "give anything to be able to return to her job if she could work without excruciating pain." Id. at 203.

On December 10, 2014 Randall's counsel clarified in a phone call with MetLife that

22

1    Randall was not appealing based on a psychiatric condition.  ECF No. 35-6 at 270.

2         On December 11, 2014 MetLife wrote to Randall through her attorney to inform him that

3    the Plan allowed for only one level of review of adverse STD benefit determinations, which had

4    already been exhausted as of December 12, 2013.  ECF No. 35-6 at 304.

5         With regard to Randall's LTD claim, MetLife had independent physician consultant Mark

6    Kaplan write a report on Randall's functional abilities on December 23, 2014.  Dr. Kaplan

7    attempted to speak with Dr. Chima, Dr. Yang, Dr. Thelen, and Dr. Bell.  ECF No. 35-3 at 69.  Dr.

8    Bell advised Dr. Kaplan that Randall "had findings of pain in a somewhat nonspecific pattern but

9    [had] not been seen for the past six months."  Id. at 70.  The other doctors were either unreachable

10   or did not provide any information.  Id. at 69-70.  Dr. Kaplan wrote that the Functional Capacity

11   Evaluation of Randall from September 17, 2014 had produced "inconsistent results" and therefore

12   he concluded "that she would be able to perform sedentary level work" at "a minimal level work

13   capability."  Id. at 70.  He noted that while Randall had been "encouraged to seek psychiatric

14   treatment," there "were limited psychiatric records provided."  Id.  Dr. Chima, Dr. Yang, Dr.

15   Thelen, and Dr. Bell were faxed Randall's records and asked to submit any reviews or comments,

16   but none of Randall's doctors responded.  Id. at 70-71, 127.

17        On January 23, 2015 Randall's attorney sent a fax to MetLife attaching a "Bone Scan"

18   from January 15, 2015 that showed degenerative changes in Randall's spine.  ECF No. 35-3 at

19   143.

20        On February 24, 2015, MetLife wrote to Randall through her attorney that it was

21   upholding its initial determination because the "medical documentation on file did not support any

22   restrictions or limitations and therefore did not demonstrate that during the Elimination Period and

23   after, she was unable to earn more than 80% of her Predisability earnings at her own occupation

24   from any employer in her local economy from April 12, 2013 and forward."  ECF No. 35-3 at 68.

### 6.    Social Security Administration Determination

26        On July 29, 2016 an Administrative Law Judge concluded in a Social Security

27   Administration determination that Randall had been disabled "since March 12, 2014" under the

28   Social Security Act.  ECF No. 36-8 at 29.  Relying on doctors' reports from mid-2014 through

United States District Court
Northern District of California

2016,[5] he determined that Randall was unable to perform any of her past relevant work and that she was credible and work motivated.  Id. at 28.

## II.    JURISDICTION

Plaintiff's cause of action arises under ERISA, a federal statute.  The Court therefore has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## III.   LEGAL STANDARD

### A.    Summary Judgment

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  Id. at 248.

Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  Indeed, it is not the duty of the district court to "to scour the record in search of a genuine issue of triable fact."  Id.  "A mere scintilla of evidence will not be

---

[5] The ALJ also mentioned that Randall started seeing Dr. Soliman for her depression in 2013.  Id. at 26.  The Judge gave "partial weight" to Dr. Soliman's opinions.  Id. at 28.

United States District Court
Northern District of California

1   sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving

2   party must introduce some significant probative evidence tending to support the complaint."

3   Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal

4   quotation marks omitted).  If the non-moving party fails to make this showing, the moving party is

5   entitled to summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

6        "In ERISA cases, as is the usual rule, the existence of a material factual dispute precludes

7   summary judgment."  Sabatino v. Liberty Life Assur. Co. of Boston, 286 F. Supp. 2d 1222, 1229

8   (N.D. Cal. 2003) (citing Tremain v. Bell Indus., Inc., 196 F.3d 970, 978 (9th Cir. 1999)).  To

9   evaluate Plaintiff's claim, the Court will conduct a bench trial pursuant to Federal Rule of Civil

10  Procedure 52 based on the administrative record and such other evidence as the Court admits.

11  Caplan v. CAN Financial Corp., 544 F.Supp.2d 984, 990 (N.D. Cal. 2008) ("Under Rule 52, the

12  court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of

13  conflicting testimony and deciding which is more likely true.") (citing Kearney, 175 F.3d at 1094-

14  95)).

15       **B.    ERISA Standard of Review**

16       "ERISA was enacted 'to promote the interests of employees and their beneficiaries in

17  employee benefit plans, and 'to protect contractually defined benefits.'"  Firestone Tire & Rubber

18  Co. v. Bruch, 489 U.S. 101, 113 (1989) (internal citations omitted).  ERISA "permits a person

19  denied benefits under an employee benefit plan to challenge that denial in federal court."

20  Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008).  "ERISA's civil-enforcement

21  provision . . . allows a claimant 'to recover benefits due to him under the terms of his plan [and] to

22  enforce his rights under the terms of the plan.'"  Muniz v. Amec Const. Mgmt., Inc., 623 F.3d

23  1290, 1294 (9th Cir. 2010) (quoting 29 U.S.C. § 1132(a)(1)(B)).

24       "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo*

25  standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

26  determine eligibility for benefits or to construe the terms of the plan."  Firestone, 489 U.S. at 115.

27  In this case, the parties have stipulated that *de novo* review is appropriate, and the Court has

28  accepted their stipulation.  See ECF No. 32.  Under *de novo* review, "the court simply proceeds to

United States District Court
Northern District of California

25

1    evaluate whether the plan administrator correctly or incorrectly denied benefits with no deference

2    given to the administrator's decision."  Abatie v. Alta Health & Life Ins. Co., 458 F.3 955, 963

3    (9th Cir. 2006) (en banc).

4         The Court determines whether Randall "was entitled to benefits based on the evidence in

5    the administrative record and 'other evidence as might be admissible under the restrictive rule of

6    Mongeluzo.'"  Opeta v. NW Airlines Pension Plan for Contract Emps., 484 F.3d 1211, 1217 (9th

7    Cir. 2009) (quoting Kearney, 175 F.3d at 1094).  Under the Mongeluzo rule, a Court may only

8    consider extrinsic evidence under certain limited circumstances.  Id. (citing Mongeluzo v. Baxter

9    Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 943-44 (9th Cir. 1995)).  Ninth Circuit

10   has "cited with approval the rule . . . that the district court should exercise its discretion to consider

11   evidence outside of the administrative record "'*only* when circumstances *clearly establish* that

12   additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision.'"

13   Id. (internal citations omitted) (emphasis in original).  The Court "'should not take additional

14   evidence merely because someone at a later time comes up with new evidence,'" and "'[i]n most

15   cases' only the evidence that was before the plan administrator at the time of determination should

16   be considered."  Id. (quoting Mongeluzo, 46 F.3d at 944).

17        "When a district court reviews de novo a plan administrator's determination of a

18   claimant's right to recover long term disability benefits, the claimant has the burden of proving by

19   a preponderance of the evidence that [she] was disabled under the terms of the plan."  Armani v.

20   Northwestern Mutual Life Ins. Co., 840 F.3d 1159, 1162-63 (9th Cir. 2016) (citing Muniz, 623

21   F.3d at 1294).  "[A] diagnosis . . . alone does not automatically amount to a finding that a claimant

22   is disabled; the claimant must also establish that [her] condition renders [her] unable to perform an

23   essential function of [her] job."  Arko v. Hartford Life and Accident Ins. Co., --- Fed. Appx. ---,

24   2016 WL 7422946, at *1 (9th Cir. Dec. 23, 2016) (citing Jordan v. Northrop Grumman Corp.

25   Welfare Benefit Plan, 370 F.3d 869, 880 (9th Cir. 2004), overruled on other grounds as recognized

26   by Salomaa v. Honda Long Term Disability Plan, 642 F.3d 666, 673-74, 678 n.33 (9th Cir. 2011)).

27   **IV.    DISCUSSION**

28        Randall seeks retroactive benefits under the Plan as well as continued health, dental,

United States District Court
Northern District of California

vision, and life insurance benefits tied to the receipt of STD and LTD benefits.  ECF No. 26 at 6.

Defendants seek summary judgment in their favor on the basis that Randall is not entitled to any

of the benefits she seeks in this action because the Plan administrator's decision to deny Randall's

claim was "manifestly correct" under *de novo* review, and because Randall cannot prove by a

preponderance of the evidence that she was disabled.  ECF No. 35 at 5.

  The Court concludes that Randall has failed to prove by a preponderance of the evidence

that she was disabled from May 7, 2013 onward and therefore that MetLife erred in denying her

benefits.  While it is clear that Randall was diagnosed with several conditions and was

experiencing pain, she has not proven that she was disabled and unable to perform the essential

functions of her job.   The Court's conclusions are based on a *de novo* review of the record and

consideration of the Social Security Administration's decision.

  **A.**  **Short Term Disability Benefits**

  Defendant MetLife argues that Plaintiff's "multi-page single-spaced list of physical

symptoms and treatment included with her appeal . . . are irrelevant to the issue of whether

Plaintiff qualified for benefits in mid-2013 because they all date from March through November

2014."  ECF No. 37 at 18.  While the dates of the medical reports are not dispositive, in this case

the physical symptoms and treatments Randall provided from March through November 2014 do

not establish Randall was disabled in mid-2013.  Although a court may look at medical evidence

rendered later to determine and contextualize the health or medical status of a patient at an earlier

point in time, see, e.g., Fontana v. Guardian Life Ins., No. C 08-01231 CRB, 2009 WL 73743, at

*4–5 (N.D. Cal. Jan. 12, 2009), the Court will not do so here because contemporary evidence from

Randall's treating physicians was to the contrary.  See Salomaa v. Honda Long Term Disability

Plan, 542 F.Supp.2d 1068, 1081 (C.D. Cal. 2008) (holding that the plan administrator properly

discounted a later report that plaintiff suffered from cognitive problems because none of the

mental health providers who treated plaintiff during the relevant time period found any cognitive

problems).  Randall provides no specific reason for the Court to find that her treating physicians in

2013 were incorrect or not credible, and the Court accepts their opinions.

  Randall does argue generally that there are "credibility disputes" regarding her doctors,

1  ECF No. 36 at 27, but the prior medical evidence is actually largely consistent.  Randall's treating

2  physicians spent large amounts of time examining her, believed her reports of pain sufficiently to

3  prescribe pain medication, and documented their findings in copious notes.  Moreover, their

4  opinions were supported by the results of appropriate medical tests.  For instance, Randall's MRI

5  taken in January 2013 was "unremarkable," while subsequent tests taken in 2014 showed some

6  degeneration.

7          Randall argues, in essence, that her consistent reports of pain and resulting diagnoses

8  should be sufficient to establish by a preponderance of the evidence that she was disabled.  Her

9  consistent reports of subjective pain are not sufficient to find disability in the face of her doctors'

10  uniform conclusions that she should return to work.  Randall's doctors concluded that she had a

11  "high degree of pain sensitivity," and that her mental health issues were likely adding to her

12  reports of pain.  "[I]ndividual reactions to pain are subjective and not easily determined by

13  reference to objective measurements," Saffon v. Wells Fargo & Co. Long Term Disability Plan,

14  522 F.3d 863, 872 (9th Cir. 2008), and the Court certainly does not discount Randall's self-

15  reports, but in the cases on which Randall relies the subjective complaints of pain are supported by

16  evidence of treating physicians who placed significant restrictions on the plaintiffs and agreed they

17  could not work.  See e.g., Schramm v. SNA Fin. Corp. Insured Grp. Ben. Program, 718 F. Supp.

18  2d 1151, 1163 (N.D. Cal. 2010).  This is not such a case.

19          Here, Randall's treating physicians in April and May 2013 addressed her pain symptoms

20  but clearly indicated she should return to work.  They did not conclude that she was totally

21  disabled or could not perform the essential functions of her job.  Moreover, as Defendants

22  correctly point out, "[t]he only medical records submitted for the period starting in June 2013

23  either simply restrict Plaintiff's ability to work for short periods without explanation, like Dr.

24  Badawi's June 11, 2013 letter and Dr. Soliman's June 27, 2013 and July 30, 2013 letters, or are

25  based on self-reported pain with no objective verification, like Dr. Yang's records beginning June

26  26, 2013." ECF No. 42 at 6.  While "the lack of objective physical findings" alone may be

27  insufficient to justify a denial of disability benefits, Eisner v. The Prudential Ins. Co. of Am., 10 F.

28  Supp. 3d 1104, 1114 (N.D. Cal. 2014), that lack combined with some doctors' beliefs that her pain

United States District Court
Northern District of California

28

1   could be managed sufficiently for her to return to work and others' lack of detailed descriptions as

2   to her limitations supports the Court's conclusion that Randall has failed to meet her burden.

3   Randall also argues that she should not be "punished" for her return to work in July 2013.

4   That is neither the intent nor the effect of the Court's order. While Randall's short return to work

5   bolsters her credibility in arguing that she was motivated to work and not manufacture a disability,

6   as she suggests, it also conforms to the medical advice she received to manage her pain and

7   continue working simultaneously. See ECF No. 38 at 17. Dr. Soliman, a mental health

8   professional, did indicate that Randall should only work part time after July 30, 2013, but the ALJ

9   gave Dr. Soliman's assessment only "partial weight," and Randall indicated to MetLife that she

10  was not appealing any decision based on a psychiatric condition. ECF No. 35-6 at 270; ECF No.

11  35-3 at 154; ECF No. 36-8 at 26.[6] In light of the administrative record, MetLife did not err in

12  denying Randall disability benefits beginning May 7, 2013.

### B.   Long Term Disability Benefits

14  The Court now turns to the question of Randall's LTD benefits. The LTD policy requires

15  the claimant to have been disabled during a 26 week elimination period. See ECF No. 35-6 at

16  133; ECF No. 35-3 at 68. Consistent with the Court's conclusion that MetLife did not err in

17  determining Randall was not disabled during the STD benefits period, Randall's medical record

18  does not establish that she suffered from a total disability rendering her unable to perform the

19  essential functions of her occupation during the elimination period required for long-term benefits.

20  MetLife therefore did not err in its denial of Randall's LTD claim.

### CONCLUSION

22  Randall requests retroactive reinstatement of benefits from December 11, 2011 to the

23  present. ECF No. 38 at 24 (citing Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154,

24  1163 (9th Cir. 2001). For the foregoing reasons, the Court concludes that Randall is not entitled to

25  reinstatement of benefits. Accordingly, the Court grants Defendants' Motion for Judgment, ECF

26

27  [6] This Court follows those courts that have considered Social Security decisions rendered after the final internal plan appeal "because [they] constitute[] additional evidence that the [plaintiff] could

28  not have presented in the administrative process." Schramm, 718 F. Supp. 2d at 1164-65.

United States District Court
Northern District of California

1    No. 35, and denies Plaintiff's Motion for Judgment, ECF No. 36.

2         IT IS SO ORDERED.

3    Dated:   February 6, 2017

4

5    _____
                    JON S. TIGAR
6                   United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28